## Case No. 6,365.

HENNESSEY et al. v. The VERSAILLES.

[1 Curt. 353; 2 Liv. Law Mag. 366.] [1]

Circuit Court, D. Massachusetts. May Term, 1853.

### SALVAGE—SERVICE AND COMPENSATION.

1. What constitutes a salvage service.

[Cited in Bowley v. Goddard, Case No. 1,736; The Cheeseman v. Two Ferry-Boats, Id. 2,-633; The Louisa Jane. Id. 8,532; The Williams, Id. 17,710; Maltby v. Steam Derrick-Boat, Id. 9,000; The Plymouth Rock, 9 Fed. 416; The Queen of the Pacific, 21 Fed. 471.]

2. What is necessary to displace the ordinary principles of adjudication, touching such service.

[Cited in Adams v. The Island City, Case No. 55; Coffin v. The John Shaw, Id. 2,949.]

3. The elements upon which the amount of compensation depends.

[Cited in Winso v. The Cornelius Grinnell, Case No. 17,883; The Camanche v. Coast Wrecking Co., 8 Wall. (75 U. S.) 477; Baker v. Hemenway, Case No. 770; The Independence, Id. 7,014.]

[Appeal from the district court of the United States for the district of Massachusetts.

---

[1] [Reported by Hon. B. R. Curtis, Circuit Justice. 2 Liv. Law Mag. 366, contains only a partial report.]

[This was a libel by Richard Hennessey and others against the ship Versailles and cargo, for compensation for salvage.]

CURTIS, Circuit Justice. On the night preceding the first day of March, the ship Versailles, having on board a very valuable cargo, and a crew of eighteen, officers and men, bound to Boston, in approaching that port, struck on a sunken ledge of rocks called the Collamores, near the shore of Cohasset, was forced over the reef, and brought to anchor. The wind was then about north-east; and with both anchors out, and the yards braced back with the larboard braces, the ship lay broadside to some rocks, which were about fifty feet off, on her larboard beam. The pumps were immediately sounded, and two feet of water found; and from midnight to seven, a. m., the water gained on the pumps, which were kept constantly going, from four to five inches an hour. At seven a. m., the master and eight men, in the long-boat, landed on the Cohasset shore, taking with them the wife, child, and a maid-servant of the master, and the ship's chronometer. The master's wife was sent immediately to Boston, by railroad, taking a message to the owners of the ship in Boston, that the vessel had been ashore, was leaking, and if they would send a steamboat, it would be all right. The long-boat and crew returned to the ship, leaving the master on shore, to procure assistance; and at a signal from him, came back, bringing the clothes of a part of the crew, and took him off. Subsequently, the clothes of the residue of the crew, and one man, who was disabled, were brought ashore, and there left. About eight, a. m., men from the shore came to the assistance of the crew, and continued to arrive from time to time, so that, at about nine, a. m., they were twenty-eight in number. When the first party arrived, the vessel had from seven to nine feet of water in her hold; and these additional men, with the crew, were able to keep the water from increasing, but not to reduce it. In this condition, the ship remained until about two, p. m., when the steamer Rescue came in sight, approached near enough to take a hawser on board, and after failing in the first attempt, in consequence of one of the ship's chains getting foul when shipped, the steamer took the ship in tow, and brought her to a wharf in Boston. These facts are not contradicted; but the principal question made at the hearing was, whether the steamer was entitled to be compensated, as for a salvage service, according to the principles which regulate that compensation in a court of admiralty. The relief of property, from an impending peril of the sea, by the voluntary exertions of those who are under no legal obligations to render assistance, and the consequent ultimate safety of the property, constitutes a technical case of salvage; and when its compensation is not fixed by such a contract as a court of admiralty will enforce, it is to be adjusted according to those liberal rules which have been found beneficial to commerce, and have long formed a part of the marine law. The inquiries, therefore, are, whether a peril of the sea was impending over this property; whether it was relieved therefrom by the steamer; and whether such a contract existed, as either deprives the libellants of the character of salvors, or fixes the measure of their compensation.

Upon the first of these questions, I entertain no doubt. An examination of this ship, upon the railway, after her arrival, showed that when she was forced over the reef, about thirty feet of her keel, from the stem, aft, was entirely destroyed; two floor timbers, four or five naval timbers, and about twenty futtock timbers, were broken; her plank upon those timbers was stove in, and the ceiling started inboard. She had from seven to nine feet of water in her hold; and upwards of forty men, including her crew and the men from the shore, had then been able only to keep the leak in check, without reducing the water in her hold. She was at anchor within fifty feet of a ledge of rocks, upon her larboard beam, from which she was kept by her sails, in the then state of the wind, which would not serve for that purpose if it should haul to the eastward, an event certainly not improbable in the month of March, on that shore. Besides the ledge of rocks on which she had struck, there were others in the immediate neighborhood. Without coming to any conclusion here, as to her precise degree of peril, where she lay, or the chance of her escape unassisted, both of which must be considered hereafter, it is enough to say, that a peril or the sea, in the sense of the marine law, was impending over her; that she was in a condition to need assistance, and capable of having a salvage service rendered to her. In estimating the amount of compensation to be allowed, the degree of peril from which the property has been delivered, is most material. To determine the nature of the service, so far as it depends upon this element of sea peril, it is only necessary to find that some extraordinary peril, something beyond the ordinary action of winds or waves, some unusually hazardous condition of the vessel, existed. And in this case, this element is too marked, to admit of the least doubt. Nor is any question made, that in point of fact, the ship was withdrawn from her dangerous predicament, and restored to ultimate safety, by the assistance of the steamer. But it is insisted, that the service of the steamer was rendered upon a contract, which deprives the libellants of the character of salvors, and reduces their claim to a quantum meruit for work and labor; that what was done was merely a towage service, and not a salvage service. I do not think there is such a thing as a towage service, known as such to the marine law, as contradistinguished from a salvage service.

Towage, like pumping or steering, making sail, or any other ship-work, may occur in the ordinary course of navigation, or may be a means of salvage. And whether it is to be paid for according to a quantum meruit, or at an agreed price, or by way of wages, or by a salvage compensation, must depend upon the circumstances under which it is performed. In this case, the Versailles being in distress, and in a condition to have a salvage service rendered to her, and having been relieved by towage, that towage was, in its nature and circumstances, a salvage service, unless it appears that there was some relation existing, by contract, between the managers of the steamer and the ship, inconsistent with their sustaining the character of salvors. It is incumbent on those who assert that such a relation existed, and who call on the court to apply, to what is primâ facie a case of salvage, some other than the ordinary principles of adjudication which govern such cases, to plead the contract, and exhibit satisfactory proof in support of it. So that what I have to determine is, whether a contract is pleaded and proved, which establishes such a relation between the asserted salvors and the ship, as deprives them of the character of salvors, by showing that the service was rendered in some other capacity; or if rendered in the capacity of salvors, that the agreement displaces the ordinary principles of adjudication, and introduces a measure of compensation derived from compact.

I must first look to the pleadings; and I do not find it asserted in the answer of either the claimants of the ship or the cargo, that such a contract existed. The only allegations bearing on these questions, in the answer of claimants of the ship, are in the eighth article of their answer, which is as follows: "These respondents allege and propound, that the services rendered by said steamboat were not, as in the eighth article of the said libel is alleged and pleaded, salvage services, but were mere towing services." The eighth article of the libel, to which this is an answer, is merely the assertion of the title of the libellants to a salvage compensation, by reason of the nature of their services described in their previous articles; it is no more than a statement of a legal result or inference, from the facts previously pleaded; and the answer to that article can scarcely be carried further than a traverse of it, founded, as the article itself was, on a previous statement of facts concerning the nature of the services. Certainly it cannot be treated as pleading a contract, sufficient to deprive the libellants of the character of salvors, or to require the court to conform to an agreed measure of compensation different from that awarded by the law. To produce either of these effects, the particular contract should have been pleaded, to the end that the court might see whether the circumstances under which it was made, its consideration, and the services actually performed, compared with those

stipulated for, were such as would induce the court to decree its execution. And, especially, if it was relied on as a bar to a salvage compensation, it should have been pleaded; distinctly, as such a bar. I should have regretted, however, to have had the case turn upon this state of the pleadings; and on examining the evidence, I do not find such proofs as would have supported the necessary allegations, in bar of a libel in a cause of salvage.

The evidence relied on by the claimants comes from the deposition of Mr. Caleb Curtis, the president of the Neptune Insurance Company, who, I infer, interposed in this matter, upon the reception in Boston of the news of the condition of the Versailles, in consequence of that company having an interest as insurers of the cargo to a small amount. It appears that about the same time the condition of the Versailles became known in Boston, it was also ascertained that two other vessels, bound to that port, were on shore a little to the eastward of the place where the Versailles was at anchor; and Mr. Curtis proves that Captain Hennessey, the master of the steamer Rescue, was sent for to come to the reading-room in State street, and was there told what was known of the condition of each of these vessels. Soon afterwards, Mr. Curtis and Captain Hennessey again met at the office of the Neptune Insurance Company, when Mr. Curtis told the captain they had not such news as to give any specific directions, but to go down, and if there was time before high-water, he might go to the assistance of the ships on shore, if the Versailles was not leaking too badly; but, at all events, to take the Versailles in tow, and bring her up before night. The Rescue was then lying at her wharf in East Boston, and soon after started, went directly to the Versailles, and took her in tow, as has been stated. It is manifest that here was no express contract, inconsistent with a technical salvage service. The steamer went on this expedition at the suggestion, and, though not stated, it is fairly to be inferred, upon the request of the witness. In some sense, this may be said to amount to an employment of the steamer; but so does any request for assistance. When the master of a vessel sets a signal of distress, it amounts to a request for assistance; and when it is tendered and accepted, there is an employment. But the question always remains, what service is rendered, and how is it to be compensated; and in the absence of a binding contract, the marine law settles that question, according to the nature of the service.

It is argued, however, that in this case, though there was no express contract to that effect, the court ought to infer there was a contract to pay a quantum meruit for work and labor at all events, though the Versailles had been totally lost. If there was such a contract, fairly made, I do not think

salvage could be claimed. But I do not find the grounds necessary for such an implication. In the absence of an express contract, the law implies that services are to be paid for, as such services are usually paid for. In the case of work and labor on land, only the fact of its performance, at the request of the defendant, is necessary to be shown, because such service is usually, reasonably paid for at all events. In the case of mariner's wages, the performance of some voyage, in which freight might have been earned, must appear, in addition to those other facts, because upon this event depends the title to wages; and so in the case of salvage, upon the ultimate safety of some of the property, as well as upon the other facts of service and request, depends the title to salvage; and consequently, the law will not imply that work and labor in salvage is to be paid for, except upon that contingency. Now, it does not appear, either that such services generally, or when performed by this particular steamer, were usually paid for, at all events, by a quantum meruit. As to the general practice, there is no evidence that the law is otherwise. And as to this particular steamer, though it appears her occupation is to tow vessels, it is not shown that it is part of her occupation to go to the relief of vessels situated as the Versailles was; and if I could infer this from the evidence, there is absolutely no evidence that her owners, officers, and crew, were usually or ever paid for such services at all events, and by a reasonable sum, for mere work and labor.

The case, therefore, stands upon a request to the master of the steamer to go to the assistance of the ship, a compliance with that request, and the performance of a service, in its nature and incidents, salvage; and such a service must be rewarded under the conditions, and according to the measure of the marine law. It has been suggested, that it is of great practical importance to the commerce of the port, that the court should not come to a conclusion which would prevent those interested in vessels of distress from sending steam-tugs to their assistance, without subjecting themselves to the payment of salvage. I do not conceive that the principles above laid down have any such tendency. It is competent for those parties to make any fair and reasonable contracts on these subjects, and this court will enforce them. But they must take care actually to make contracts, and not leave them to be inferred from facts, which in point of law, will not justify such inferences.

The remaining inquiry is, what compensation ought to be paid to the steamer. The principles upon which it is to be assessed are well settled, though their satisfactory application is often difficult. The value of the property saved, the degree of peril from which it was delivered, the risk of the property, and especially of the persons of the salvors; the severity and duration of their labor, the promptness of their interposition, and the skill exhibited by them, are all to be considered. In this case, the value of the property saved was large, about one hundred and twenty thousand dollars. The remuneration is of course to be greater on this account, not only because a greater benefit was received, but also because it enables the court to confer such a reward as to operate as an encouragement to salvors, without casting a heavy burden upon an amount of property too small to be adequate to bear it. In my opinion, the degree of peril, from which the ship and cargo were delivered, was very considerable. Without undertaking to say, that, with assistance from the shore, the ship could not have been worked by her sails clear of the rocks, and brought into the harbor, it is clear that the attempt would have been attended with much risk, even with the wind and the bearings of the rocks as the witnesses for the claimants give them. Nothing can show this more clearly, than the fact, that the master did not make the attempt, but continued to lie at anchor there five hours after the men from the shore came on board, although he must have known, that at that season of the year, the wind was liable to change at any moment, so as to render his unaided escape impossible. In point of fact, the wind did so change; the witnesses do not agree on the precise point of time when; but whether it was just before or just after the ship was taken in tow, does not seem to me very material, unless it appears, that the master would have made the attempt to get out before the wind changed, if the steamer had not arrived; and he does not so testify, nor had he then begun to make his preparations for the difficult evolution he describes, by which he says he should have tried to get under way, headed to the eastward, without coming in contact with the rocks on the larboard beam. On the other hand, I am not satisfied, by the evidence, that the peril to the steamer was materially greater than what is ordinarily incurred in navigating, for a short distance, in the neighborhood of ledges of rocks, in a narrow channel. If any accident should occur to the machinery, the danger would, no doubt, be great. But this steamer is said to have been built and employed as a tow-boat, and, it is reasonable to infer, had strength suitable to that business. There does not appear to have been any such unusual strain put upon her, as ordinarily would, or in fact did, injure her machinery. It is not proved that she was worked under an unusual head of steam. There was not, therefore, such a reasonable probability of injury to the machinery, as ought to form any considerable element in the computation of the reward. The labor of the men was no more than ordinary; and the length

of time employed was about half a day. The sea was certainly not smooth; but it was not so bad as to cause the ship and steamer to labor much, and thereby much increase the difficulty of towing. After getting out from among the rocks, the ship used her sails; and though the water in her must have rendered her somewhat crank, it does not appear that, viewed simply as a towage service, it was one of great effort. The fact that the vessel employed was a steamer, is undoubtedly to be taken into consideration; for sound policy requires, that they who are able to render the most efficient aid, by means of expensive boats, should be encouraged to do so. Speaking in general terms, it may be said, that an important benefit was conferred upon the claimants, by saving a large amount of their property, exposed to very considerable peril, through the prompt assistance of this steamer; rendered, however, with but small risk or labor, or loss of time. In such cases, the allowance of a specific proportion of the property saved has not been, of late years, much practiced in England, or, so far as cases are reported, in this country. A more exact appreciation of the merits of salvage services, and a nicer graduation of their rewards, have been attempted. This opens a large and difficult field of judgment and discretion, in which great caution is necessary; for it must not be forgotten, either that the security of life and property in navigation, and the general interests of commerce, require rewards for salvage beyond the usual rates of compensation for the exact work done, or that individuals must not be oppressively burdened for this public benefit.

After considering all the circumstances, I am of opinion that the sum of three thousand six hundred dollars is the proper sum to be allowed. If the claimants do not agree upon the apportionment of this sum upon the several interests at risk, I shall refer it to an assessor, to report thereon. The libellants may agree on the distribution of the salvage compensation; but I shall require the agreement to be reported to, and sanctioned by the court, for the protection of the crew.